OF THE

## STATE OF IOWA

AT

## DES MOINES, JANUARY TERM, 1908.

AND IN THE SIXTY-SECOND YEAR OF THE STATE.

---

G. H. FRANCE, Administrator, etc., Appellant, v. FLORENCE
MUNRO and W. D. MUNRO, Appellees.

**Usury:** PAROL EVIDENCE: VARIANCE OF WRITING. It is permissible to
1 show by parol that one described in an usurious loan contract
as the agent of the borrower is in fact the agent of the lender,
as in the case of fraud in general; and the same is not a violation
of the rule forbidding the variance of a writing by parol testi-
mony.

**Usury:** COMMISSIONS OR BONUS TO AGENT. One who is given full
2 charge of the funds of a nonresident with power to loan the same
when, to whom and upon such terms as he sees fit, and when
repaid to again loan the funds and in all respects deal with the
money the same as though it were his own, is the agent of the
lender; and an exaction of more than the lawful contract rate,
even though the excess be styled a commission, renders the contract
usurious.

VOL. 138 IA.— 1

*Appeal from Polk District Court.*— HON. W. H. McHENRY, Judge.

THURSDAY, MARCH 19, 1908.

ACTION in equity to recover upon a promissory note and to foreclose a chattel mortgage. The defendants admitted the note, alleged usury in the consideration therefor, and pleaded partial payment. The trial court sustained the plea of usury, and after applying payments made found plaintiff entitled to recover the remainder of $50.50, and to a foreclosure of the mortgage to that extent. The plaintiff appeals.— *Affirmed.*

*J. K. Macomber,* for appellant.

*F. E. Duncan* and *W. B. Brown,* for appellees.

WEAVER, J.— At the time of the loan in controversy the appellees, husband and wife, were in straitened circumstances, their household furniture and other personal property being incumbered by a mortgage, which was about to be foreclosed. Mrs. Munro applied for advice or assistance to her neighbor, Judge Miller, and he introduced her to the plaintiff, a money lender and broker. There appear to have been two interviews between the parties, the first being on August 10, 1904, and the second on the following day, when the transaction was consummated. At first the plaintiff made some objection to the character of the security offered, but finally agreed to loan the appellants the sum of $350. In closing the deal appellant prepared, and the appellees executed at the same time, and as a part of the same transaction, three separate documents. The first of these was the statement of the desire of appellees to procure a loan of $363.50 on certain specified security, which statement was followed by a clause in the following form:

I authorize G. H. France, as agent for me, to negotiate for said loan, for which I agree to pay $13.50 cash in hands as commission and interest. The lawful contract rate of interest that my note bears for the payee above described time is to first be taken from the $13.50 above described, and the remaining amount to go to G. H. France, my authorized agent, as commission or pay for his services for procuring the loan for me for said time, for examining the securities, the records of the county, writing the papers, collecting and paying over the money, and such additional work and trouble as he is required to do in procuring said loan.

The next paper was a promissory note for the sum of $363.50, payable one month after date to J. K. Little, or bearer, with interest at 8 per cent. per annum at appellant's office in Des Moines. Payment of this note was secured by the third of the papers mentioned, a chattel mortgage on a list of household furniture, silverware and glassware. The testimony of the appellees, corroborated by that of Judge Miller, is to the effect that during these negotiations appellant made no claim to be acting as agent for another or otherwise than in his own right. According to the statements of these witnesses appellant said to them that he could not lend the money at 8 per cent. but must have $12.50 per month instead, payable monthly, but mentioned nothing about commission. These terms having been agreed to, the papers were made out, and appellant paid over to Mrs. Munro, or to Judge Miller for her, the sum of $350. Miller did not read the papers, and Mrs. Munro, who conducted the business for appellees, signed them, as she says, without reading them, and without hearing them read, assuming them to be all right, as she was assured by the appellant; and it was not until a considerably later date that appellees or Judge Miller became aware that appellant claimed to have been acting as an agent only, and that the written evidences of the transaction had been made to indicate a third person as the real party in interest. It is true appellant testified that he informed the appellees that he was acting as agent for J. K. Little, and that

the excess which he charged over the lawful rate of interest was his commission for procuring the loan; but in this a decided preponderance of the testimony is against him. Though the note is made payable in one month, it is very clear from the evidence that there was no expectation on part of either that it would be paid when due. At the end of the month, and at the end of each succeeding month thereafter down to and including September, 1906 (with one or two slight variations in the regularity of dates and amounts), Mrs. Munro paid or sent to the plaintiff the sum of $12.50, and at the time of each payment, or very soon thereafter, appellant prepared and obtained her signature to a paper in one of the following forms; the date of the period of extension being varied according to the date of the payment made, but on no occasion was the extension for more than one month:

G. H. France, Loan Broker, Des Moines, Iowa. This is to certify that I owe on my note of $363.50, made and executed by me August 11, 1904, in favor of J. K. Little, which note matured September 11, 1904, $363.50; that I have paid to apply on the principal no dollars; that what payments I have made to G. H. France from time to time, including payment made this day, have been made to him as commission or pay for his services as my authorized agent to procure loan and extension of time on same to February 11, 1905, for examining the records and securities at such time as he might deem proper, and such additional work as he has been required to do in procuring said loan and extension of time for me to said date, and interest due to said payee at 8 per cent. per annum; that I have no claim or defense against said note, and will pay the same in full when due; that no part of the money paid is to apply on the debt due payee, except as described above. Mrs. W. D. Munro.

G. H. France, Loan Broker, Des Moines, Iowa. I desire an extension of time on my note of $363.50, made and executed by me August 11, 1904, in favor of J. K. Little, which note matured September 11, 1904. I authorize G. H. France, as agent for me, to negotiate for said extension of time to October 11, 1904, for which I agree to pay $12.50

as commission and interest. The annual rate of interest that my note bears for the payee for the above-described time is to be first taken from the $—— above described, and the remaining amount to go to G. H. France, my authorized agent, as commission or pay for his services for attending to said loan for me for said time, for re-examining the records and the securities at such times as he may deem proper, and such additional work as he is required to do in procuring said extension of time for me. I still owe to the payee on said note $363.50. I have no claim or defense against said note, and will pay the same in full when due. Florence A. Munro.

The payments thus made amounted to $303.50, or, if we included the sum deducted in advance, they aggregated $317. Appellant's explanation of these transactions and of his own manner of doing business is substantially as follows: He says that the payee named in the note was his niece, who resided in Wisconsin, and whose money he had been handling and investing in Iowa since the year 1893. Miss Little has since died, and appellant is duly appointed administrator of her estate in Wisconsin. During all of the period named he held Miss Little's power of attorney to make loans and to make and enforce collections due her in this State. Indeed the money in appellant's hands, or a large part thereof, appears to have originally belonged to his father (Miss Little's grandfather) for whom he was handling and loaning it out in this State. On the death of his father the money descended to his sister, and upon her death to Miss Little. During this long period, and through all of these changes in ownership, the fund remained in the possession and immediate control of the appellant, and he made loans therefrom according to his own judgment. He alone passed upon the sufficiency of the security taken, and so far as appears none of the loans taken by him were ever submitted to her for approval. When the balance of cash on hand belonging to his niece was insufficient to make the desired loan, he sometimes supplemented it with his own money. At other

times he admits having loaned his own money and taken the
securities in Miss Little's name, and that $3,000 or $4,000
of such loans were outstanding or at least uncanceled of
record at the time of her death. As administrator he had
listed the note in suit as belonging to the estate, but there
were other outstanding mortgages taken by him in her name
which he did not so list. It is a significant fact that ap-
pellant professed to be unable to produce any of the corre-
spondence between himself and his niece or any books showing
his account with her prior to the year 1904, the year in which
this loan was made. The account shown of dealings since
that date and appellant's statement as a witness indicates
that he kept a book account with her in which she was cred-
ited with moneys received and collections made, and charged
with loans made from her funds and with moneys sent by
him to her. The collections made were kept and cared for
by him, except small sums remitted occasionally, as she might
need. So far as shown she had no more actual knowledge
of the individual loans, and exercised no more judgment or
choice in relation thereto than a perfect stranger to the trans-
actions. It was wholly left to the appellant to exercise his
own judgment and discretion and to protect her interests as
he might deem wise or best, and, so far as the record shows,
she did not undertake to pay him any compensation for his
services, unless we may infer from the situation that he was
to receive his profit in what he could obtain from borrowers
in excess of the lawful interest charged. In short, if we give
full credit to everything he says, he occupied the relation of
attorney and personal representative of his niece, and his
acts with reference thereto were her acts. If there be any
alternative conclusion from the conceded facts, it is that as
to the money placed in his hands by her, the uncle and niece
stood in the relation of debtor and creditor. Accepting either
conclusion, the result is the same. If the latter were their
true relation, the appellant, in making the loan, though tak-
ing the securities in her name, was acting in his own right,

and his exaction of the equivalent of more than forty per
cent. interest was usury. If, as claimed, he occupied a more
intimate and fiduciary relation of attorney and personal rep-
resentative, and made the loan for and in her behalf, pre-
scribing its terms, passing upon the security offered, and do-
ing all things with reference thereto which she might have
done if personally present, he was her *alter ego* in the trans-
action, and his exaction of the exorbitant rate was her ex-
action. Either result reveals the taint of usury.

It is no answer to say that this conclusion involves a
disregard to the rule against parol testimony to vary the
terms of a written contract. The game of hide and seek

1. USURY:
parol evidence:
variance of
writing.

between the usurer and the law is not the prod-
uct of recent evolution, and the rule has long
been settled that, as in case of fraud in gen-
eral, the rule referred to will not be allowed to exclude proof
of the true nature of a contract into which the usurer is
alleged to have entered. *Seekel v. Norman,* 71 Iowa, 264;
*Train v. Collins,* 2 Pick. 145; *Scott v. Lloyd,* 9 Pet. (U. S.)
418 (9 L. Ed. 178). Says the Minnesota court: "All that
is required to establish a case of usury is a fair preponder-
ance of the evidence, and there is no shift or device on part
of the lender to evade the statute under or behind which the
law will not look to ascertain the real nature of the trans-
action." *Phelps v. Montgomery,* 60 Minn. 303 (62 N. W.
260).

As is well known, perhaps the most frequent device em-
ployed to effect usury is through the use of the name of some
personal or family friend for whom the lender acts as osten-

2. USURY:
commission
or bonus
to agent.

sible agent, and all of the excess which can be
exacted from the distress or recklessness of
the borrower is sought to be accounted for as
" commission." The ease with which this fraud is prac-
ticed requires that courts scrutinize with care business deal-
ings presenting such phases to see that the law is not evaded.
It should not, however, be permitted to place the brand of

illegality upon the conduct of one who acts in good faith as the agent of the borrower in securing for him a loan of money for which he charges and receives a reasonable compensation. Such transactions, when exhibiting no evidence of being a mere scheme to conceal usury, have often been upheld in our decisions. *Gokey v. Knapp,* 44 Iowa, 32; *Greenfield v. Monaghan,* 85 Iowa, 211; *Richards v. Purdy,* 90 Iowa, 502, and other cases cited in the decisions here referred to. But the case at bar differs very radically from these and other precedents cited in behalf of the appellant. It comes much more nearly within the rule applied by this court in *McNeely v. Ford,* 103 Iowa, 508. There the borrower, desiring a loan, applied to one McNeely, who furnished him $600, and took from him his promissory note payable to McNeely's wife for $642, bearing the highest legal rate of interest from date. The excess was embodied in the note, and the borrower testified that it was for additional interest; but McNeely claimed that it was simply his commission as agent for procuring the loan. When the note became due the time of payment was extended, and an additional payment was exacted in excess of the legal rate. It was shown upon the trial that the husband did have money belonging to the wife, which she trusted him to manage and lend in her name at his discretion, and that he invested it as best he could, and did not consult her as to the terms of loans so made. Upon this showing we said there was "no doubt that in this transaction McNeely acted solely as agent for his wife, and was not entitled to any commission from the defendant for effecting the loan, and that the several amounts added to the notes over and above the amount received by the defendant were usurious." Directly in point is the case of *Hall v. Maudlin,* 58 Minn. 137 (59 N. W. 985, 49 Am. St. Rep. 492). There as here a nonresident left money in the hands of one Everett, a resident agent, to whom he gave full power to invest it according to his best judgment. Stating the case the court says:

He took no part in the business himself, but left everything to the sole discretion of Everett, who never consulted him, but loaned the money when and to whom and upon such terms as he saw fit, and when it was repaid, loaned it again as he pleased. Everett's general mode of business was to charge borrowers in addition to the interest provided in the note a bonus or commission. . . . There is no evidence that Everett had any express authority to charge more than the legal rate of interest, and no direct evidence that his principal knew that he was doing so; but it does appear that he paid Everett nothing for his services, and that the understanding between them was that he would get his commission out of the charges, and that whatever he realised from the business would be from commissions that people would pay him for getting the money for them. When the loan was made to the defendants, Everett, in accordance with his usual custom, retained out of the amount $25, giving the defendant only $225. It is idle to claim from the evidence that Everett was in this transaction a loan broker, or in any sense an agent of the defendants. He was acting solely as the agent of the plaintiff, and performed no services beyond what any lender would do in his own behalf. . . . If the business had been conducted by plaintiff personally, no one would question the usurious character of the transaction. No one would claim that where a man is lending his own money he can charge to the borrower in addition to the maximum legal rate of interest all of the expenses of transacting his own business, including compensation for his own service in attending to it. And if he can cast all of this burden upon the borrowers by merely turning over the business to a general agent, there would be little left of the statute against usury. . . . Where the lender thus places his business under the exclusive and unlimited control of a general agent, if the agent exacts usury, the case stands precisely as if it had been done by the principal personally, and such agent has no right to exact from the borrower, either for alleged services or otherwise, anything which the principal might not have lawfully exacted had he transacted the business in person.

In all essential particulars the facts here stated parallel the facts in the case at bar, and we are content to follow the rule there announced as eminently righteous and just. To

the same general effect see *Dayton v. Dearholt,* 85 Wis. 151
(55 N. W. 147); *Horkan v. Nesbit,* 58 Minn. 487 (60 N.
W. 132); *Kemmitt v. Adamson,* 44 Minn. 121 (46 N. W.
327); *Banks v. Flint,* 54 Ark. 40 (14 S. W. 769, 16 S. W.
477, 10 L. R. A. 459); *Fowler v. Trust Co.,* 141 U. S. 384
(12 Sup. Ct. 1, 35 L. Ed. 786); *Olmstead v. Security Co.,*
11 Neb. 487 (9 N. W. 650); *Pfenning v. Scholer,* 43 N. J.
Eq. 15 (10 Atl. 833); *Payne v. Newcomb,* 100 Ill. 611
(39 Am. Rep. 69); *Cheney v. White,* 5 Neb. 261 (25 Am.
Rep. 487); *Stein v. Swensen,* 46 Minn. 360 (49 N. W. 55
24 Am. St. Rep. 234); Note to *Bank v. Cook,* 60 Ark.
288 (46 Am. St. Rep. 198); *Dade v. Spalding,* 52 Minn.
356 (54 N. W. 591).

It is not necessary to go to the extent of some of these
decisions to support our conclusions in the present case, but
we cite them to show the general tendency of the courts to
penetrate the masks under which evasions of usury laws
habitually hide, and to say that contracts so tainted shall be
enforced no further than the statute permits.    In *Dade* v.
*Spalding, supra,* the circumstances of the loan by an alleged
agent with the exaction of a bonus or commission at the out-
set, and for each monthly extension and the careful pro-
curement of a written statement from the borrower with each
monthly renewal, was after the manner or plan pursued by
the appellant herein. Upon this showing Mr. Justice Mitchell
very aptly observed: " The formalities and contrivances re-
sorted to to clothe the transaction on Hoffman's part with the
appearance of that of an agent were so unusual and yet so
transparent as to fully warrant the jury in concluding that
he, and not Webster, who never once appeared in the trans-
action or on the trial, was the real principal. If transparent
contrivances of this sort to evade the statute should prove
effectual, the administration of the law would fall into de-
served disrepute. We never met with a case where the maxim
that unusual clauses always excite suspicion was more ap-
plicable." It would be hard to imagine a case to which

that animadversion could be more fitly directed than the one here presented. The workmanship of the plan employed is entirely too elaborate and artistic to be the natural accompaniment of an ordinary business transaction, in which there is nothing to conceal.

That the trial court reached the correct conclusion is not open to any reasonable doubt.

The judgment appealed from is *affirmed.*